UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEVEN KENNETH-NEILSON HALLER,

        Petitioner,        Case No. 1:16-cv-206

v.        Honorable Robert Holmes Bell

SHERMAN CAMPBELL,

        Respondent.
_____/

**OPINION**

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Promptly after the filing of a petition for habeas corpus, the Court must undertake a preliminary review of the petition to determine whether "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court." Rule 4, RULES GOVERNING § 2254 CASES; *see* 28 U.S.C. § 2243. If so, the petition must be summarily dismissed. Rule 4; *see Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970) (district court has the duty to "screen out" petitions that lack merit on their face). A dismissal under Rule 4 includes those petitions which raise legally frivolous claims, as well as those containing factual allegations that are palpably incredible or false. *Carson v. Burke*, 178 F.3d 434, 436-37 (6th Cir. 1999). After undertaking the review required by Rule 4, the Court concludes that the petition must be dismissed because it fails to raise a meritorious federal claim.

**Factual Allegations**

Petitioner Steven Kenneth-Neilson Haller is incarcerated with the Michigan Department of Corrrections (MDOC) at the Carson City Correctional Facility. On March 12, 2013, Petitioner pleaded guilty to one count of assault with intent to do great bodily harm less than murder, MICH. COMP. LAWS § 750.84, and one count of first-degree home invasion, MICH. COMP. LAWS § 750.110(A)(2). On April 8, 2013, the Court sentenced Petitioner to 12 to 20 years for home invasion to be served concurrently with his sentence of 6 to 10 years for assault.

In his memorandum of law, Petitioner describes the facts underlying his crimes as follows:

> Early in the morning of August 11, 2012, around 2:00 a.m., Mr. Haller arrived at Ms. Malakowsky's room. (P.E., 7.) This was a normal occurrence between the two. (P.E., 6-7.) They had texted throughout the day, and Ms. Malakowsky invited Mr. Haller to come to her room. (P.E., 6-7, 25-26.) They began to have consensual sexual intercourse. (P.E., 8, 10, 20, 27, 28.)
>
> Ms. Malakowsky claimed that Mr. Haller became more aggressive than she was comfortable with on this occasion and asked to stop, which they did. (P.E., 8-9, 22, 30, 36, 48, 51.) Ms. Malakowsky said that Mr. Haller told her that he loved her. (P.E., 9, 31.) She testified that she did not feel the same way and, therefore, did not respond. (P.E., 9-10, 31.) She then claimed that his next action was to straddle her and start choking her with both hands. (P.E., 10, 32-33.) She said she blacked out and when she "woke up" he was sitting on the floor next to the futon that she was still laying on. (P.E., 11, 34.)
>
> Mr. Haller was concerned and asked if that was "too much" and grasped her ankle in what she took to be a comforting measure. (P.E., 12, 35, 36.) Ms. Malakowsky testified that she told him not to touch her or she would call the police. (P.E., 12-13, 35-36, 36-37.) She then claimed that Mr. Haller pulled her towards him, punched and choked her, and kept asking if she was going to tell or call the police. (P.E., 13, 35, 37.) Mr. Haller then allegedly told Ms. Malakowsky that he was going to have to kill her. (P.E., 15-16, 39-40, 41.)
>
> During a lull in the conversation, when she claims that Mr. Haller may have been reaching for razor blades that she had left on the windowsill because she had

      been using them to cut herself, Ms. Malakowsky went to the community bathroom and locked the door behind her. (P.E., 18, 43.) She testified that she got the attention of another resident, who called the police. (P.E., 18-19, 44, 45.) Mr. Haller was arrested at his residence that same day. (P.E., 18-10, 44, 45.)

(ECF No. 1-1, PageID.7-8.)[1]

      Although Petitioner pleaded to home invasion, he was initially charged with torture in violation of MICH. COMP. LAWS § 750.85. As part of Petitioner's plea bargain, the charge of torture, which carried a maximum sentence of life, was dismissed and replaced with the lesser charge of first-degree home invasion, which carried a maximum sentence of twenty years. At Petitioner's plea hearing, though he pleaded guilty to the first-degree home invasion charge, he admitted conduct that established he had committed the crime of torture. (ECF No. 1-11.)

      At Petitioner's sentencing hearing a few weeks later, the Court calculated the possible range of Petitioner's minimum sentences for first-degree home invasion as 57 to 95 months. (ECF No. 1-12, PageID.229.) The Court departed from that range, imposing a minimum sentence of 12 years (144 months). (*Id.*) The Court provided two independent justifications for the departure: first, 144 months fell at the low end of the range for the crime of torture, the crime that Petitioner acknowledged he had committed in the plea proceedings; and second, the presentence investigation report (PSIR) disclosed, through three layers of hearsay[2], that Petitioner had acted abusively in five prior relationships with women. (*Id.* at Page.ID 229-230.) That prior abusiveness,

---

[1] The term "P.E." references the transcript of Petitioner's preliminary examination which is attached as an exhibit to his petition. (ECF No. 1-10.)

[2] The PSIR indicates that the police report disclosed that detectives had interviewed five of Petitioner's former girlfriends and they had made statements regarding Petitioner's statements and conduct. (ECF No. 1-8.) Petitioner denied the conduct and statements attributed to him by his former girlfriends. (*Id.*)

the Court reasoned, demonstrated a dangerousness that was not otherwise reflected in the home invasion guidelines. (*Id.*)

Petitioner filed a delayed application to appeal in the Michigan Court of Appeals on October 3, 2013. He raised two issues: (1) the circuit court committed reversible error when it departed from the sentencing guidelines without a substantial and compelling reason; and (2) the circuit court committed reversible error when it departed from the sentencing guidelines to an unjustified degree violating the settled principle of proportionality. (Application, ECF No. 1-2, PageID.35.) The application for leave to appeal was denied for lack of merit in the grounds presented. (Order, ECF No. 1-3.)

On February 11, 2014, Petitioner filed an application for leave to appeal in the Michigan Supreme Court. In that court he raised the same two issues he had raised in the court of appeals and added one new issue: (3) the trial court violated Mr. Haller's due process rights by imposing a sentence one and one-half times the maximum Michigan guideline score based on assumptions of facts that were never subject to jury fact-finding, cross-examination, or the application of reasonable doubt standards. (Application, ECF No. 1-4, PageID.65.) The Michigan Supreme Court denied the application on May 27, 2014. (ECF No. 1-5.)

On August 12, 2014, Petitioner filed a petition for certiorari in the United States Supreme Court raising only one issue, issue (3) from his Michigan Supreme Court application. The United States Supreme Court denied the petition on March 2, 2015.

Petitioner timely filed the instant petition for habeas corpus on February 25, 2016. The petition raises one issue: Mr. Haller's due process rights were violated when the trial court unconstitutionally relied on triple hearsay in the presentence investigation report that was false and

other triple hearsay statements that did not meet the sufficient indicia of reliability that the Constitution requires to increase Mr. Haller's sentence. Although Petitioner states only one issue in his form petition, he identifies two distinct issues in his supporting legal memorandum. Petitioner's principal argument contends that the sentence violated his due process rights because it was based on inaccurate information from the PSIR. In addition to that argument, Petitioner contends that he suffered a violation of his Sixth Amendment right to a trial by jury when the court, instead of a jury, made factual findings that had the effect of raising his minimum sentence.

## Discussion

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

> I.  Petitioner has failed to demonstrate that the court relied on information that was false during sentencing

Federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature. *See Hutto v. Davis*, 454 U.S. 370, 373-74 (1982). Nonetheless, a sentence may violate due process if it is based upon material "misinformation of constitutional magnitude." *Roberts v. United States,* 445 U.S. 552, 556 (1980), *quoted in Koras v. Robinson,* 123 F. App'x 207, 213 (6th Cir. 2005); *see also United States v. Tucker,* 404 U.S. 443, 447 (1972); *Townsend v. Burke,* 334 U.S. 736, 741 (1948). To prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false information in imposing the sentence. *Tucker*, 404 U.S. at 447; *United States v. Polselli*, 747 F.2d 356, 358 (6th Cir. 1984); *Koras,* 123 F. App'x at 213 (quoting *United States v. Stevens,* 851 F.2d 140, 143 (6th Cir. 1988)).

Petitioner claims that the trial court relied upon false information because the statements attributed to his former girlfriend, Brandie Courtade, were false. He contrasts her statements reported in the PSIR (ECF No. 1-8) with a written communication she directed to the court on Petitioner's behalf a week before he was sentenced (ECF No. 1-9). Neither statement is sworn. The two statements are in no respect inconsistent. Although Petitioner contends the Ms. Courtade's statements in the PSIR are false, the written communication she apparently authored does not establish or support that contention.

Petitioner argues that Ms. Courtade would have testified that the PSIR statement attributed to her, to the effect that Petitioner had choked her, was true but that the choking was

consensual and not assaultive. There is no affidavit to support Petitioner's argument. There is only Petitioner's statement that Ms. Courtade would have so testified.

The PSIR indicates "Ms. Courtade advised that on one occasion, during the course of a sexual encounter, the defendant began to choke her. Afterwards she was ok with the choking." (ECF No. 1-8, PageID.125.) That is almost exactly how Petitioner's counsel at sentencing characterized Ms. Courtade's anticipated testimony: "She agreed the two of them had an act of rough sex that involved choking but it was consensual and afterwards he asked her if it was ok and she said yes." (ECF No. 1-12, PageID. 220.) The record Petitioner has supplied belies his claim that the statements attributed to Ms. Courtade in the PSIR were false. To the contrary, the record indicates that Ms. Courtade's PSIR was completely accurate as to the most significant matter, Petitioner's choking of Ms. Courtade.[3] Petitioner's claim that he was sentenced based on false information is without merit.[4]            .

> II.   Petitioner has failed to demonstrate a Sixth Amendment right to have a jury determine the facts supporting the court's minimum sentence determination

Petitioner argues that his sentence was contrary to clearly established federal law because the sentencing judge violated his Sixth Amendment right to a trial by jury by using, to enhance his sentence, facts that had not been admitted by Petitioner or found by a jury beyond a reasonable doubt. Petitioner bases his argument on a line of cases beginning with *Apprendi v. New*

---

[3]The accuracy of the PSIR statement with regard to the choking incident between Petitioner and Ms. Courtade also indicates that the "triple hearsay" Petitioner complains about was not inherently unreliable.

[4]Even if Petitioner could show that the PSIR statements from his former girlfriends were false in some respect he could not succeed in establishing the court's reliance on those statements in the constitutional sense. The court certainly mentioned Petitioner's cruelty to other women as a justification for his departure from the guidelines range for first-degree home invasion. (ECF No. 1-12, PageID. 23-24.) But, the court noted that the primary and **independent** justification for the departure was the nature of the crime Petitioner admitted committing: torture. (*Id*. at 23.)

*Jersey*, 530 U.S. 466 (2000), and ending with *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151 (2013).[5] In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. *Apprendi* enunciated a new rule of Sixth Amendment jurisprudence. In the subsequent case of *Blakely*, the Court applied the rule of *Apprendi* to a state sentencing guideline scheme, under which the maximum penalty could be increased by judicial fact-finding. The *Blakely* Court held that the state guideline scheme violated Sixth Amendment rights, and reiterated the rule that any fact that increased the maximum sentence must be "admitted by the defendant or proved to a jury beyond a reasonable doubt." *See Booker*, 543 U.S. at 232 (citing *Blakely*, 542 U.S. at 303).

Unlike the State of Washington's determinate sentencing system at issue in *Blakely*, the State of Michigan has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum term. The maximum sentence is not determined by the trial judge, but is set by law. *See People v. Drohan,* 715 N.W.2d 778, 789-91 (Mich. 2006) (citing MICH. COMP. LAWS § 769.8). Only the minimum sentence is based on the applicable sentencing guideline range. *Id.*; *and see People v. Babcock*, 666 N.W.2d 231, 236 n.7 (Mich. 2003) (citing MICH. COMP. LAWS § 769.34(2)). The Sixth Circuit authoritatively has held that the Michigan indeterminate sentencing system does not run afoul of *Blakely*. *See Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. 2009) (affirming district court's dismissal of prisoner's claim under *Blakely v.*

---

[5]Although not cited by Petitioner, this line of cases also includes *Ring v. Arizona*, 53 US 584 (2002), *United States v. Booker*, 543 U.S. 220 (2005), and *Blakely v. Washington*, 542 U.S. 296 (2004).

*Washington* because it does not apply to Michigan's indeterminate sentencing scheme); *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007).

The Supreme Court expanded the *Blakely* reasoning to mandatory minimum sentences in *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151 (2013), decided only two months after Petitioner was sentenced. Shortly thereafter, while Petitioner's application for leave to appeal was still pending in the Michigan Court of Appeals, that court concluded that *Alleyne* only prohibited judicial factfinding used to determine a mandatory minimum sentence, but had no impact on judicial factfinding in scoring the sentencing guidelines producing a minimum range for an indeterminate sentence, the maximum of which is set by law. *See People v. Herron*, 845 N.W.2d 533, 539 (Mich. App. 2013) *rev'd* 870 N.W.2d 561 (2015).[6] The Sixth Circuit also concluded that *Alleyne* did not decide the question whether judicial factfinding under Michigan's indeterminate sentencing scheme violated the Sixth Amendment. *See Kittka v. Franks*, 539 F. App'x 668, 673 (6th Cir. 2013). As a consequence, the Sixth Circuit held, the question is not a matter of clearly established Supreme Court precedent. *Id.* (citing *Montes v. Trombley*, 599 F.3d 490, 498 (6th Cir. 2010)); *see also Saccoccia v. Farley*, 573 F. App'x 483, 485 6th Cir. 2014) ("But *Alleyne* held only that 'facts that increase a mandatory *statutory* minimum [are] part of the substantive offense.'. . . It said nothing about guidelines sentencing factors . . . .) (quoting *Alleyne*, 133 S. Ct. at 2161 (emphasis added)).

Recently, however, in *People v. Lockridge*, 870 N.W.2d 502 (Mich. 2015), in a 5-2 decision, the Michigan Supreme Court considered the question the Michigan Court of Appeals had

---

[6]*Herron* was reversed following the decision in *People v. Lockridge*, 870 N.W.2d 502 (Mich. 2015). *Lockridge* is discussed in detail below.

faced in *Herron* and reached the opposite conclusion. The *Lockridge* court reasoned that, because the "guidelines *require* judicial fact-finding beyond facts admitted by the defendant or found by the jury to score offense variables (OVs) that *mandatorily* increase the floor of the guidelines minimum sentence range," they increase the "mandatory minimum" sentence under *Alleyne*. *Lockridge*, 870 N.W.2d at 506. As a consequence, the *Lockridge* court held that the mandatory application of Michigan's sentencing guidelines was unconstitutional, and the remedy was to make them advisory only. *Id.* at 520-521.

The Michigan Supreme Court's decision in *Lockridge* does not render the result "clearly established" for purposes of habeas review. This Court may consider only the "clearly established" holdings of the United States Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. For the same reasons, it may not consider the holdings of state courts. Instead, this Court may only grant relief on habeas review if the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1706-07 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

As is apparent from the reasoned decisions of the Michigan Court of Appeals in *Herron*, 845 N.W.2d at 539, and the Sixth Circuit in *Kittka*, 539 F. App'x at 673, and *Saccoccia*, 573 F. App'x at 485, as well as the decision of the dissenting justices in *Lockridge* itself, reasonable

jurists could and did disagree about whether *Alleyne* applied to the calculation of Michigan's minimum sentencing guidelines. *Alleyne* therefore did not clearly establish the unconstitutionality of the Michigan sentencing scheme and cannot form the basis for habeas corpus relief.

Even if it could be said that the decision in *Alleyne,* as applied to the Michigan sentencing scheme, and as that scheme was interpreted by the *Lockridge* court, represented "clearly established" federal authority for purposes of collateral habeas corpus review, Petitioner could not prevail. The judicial fact-finding to which Petitioner now objects had no bearing on the determination of Petitioner's guidelines minimum range. Thus, *Alleyne* does not apply here. From the inception of this line of authority in *Apprendi* to its most recent refinement in *Alleyne*, the United States Supreme Court has never suggested that judicial fact-finding in support of the court's exercise of discretion, as happened here when the court departed upward from the minimum range established by the guidelines, violates the Sixth Amendment.

The distinction is apparent in the remedy adopted to correct the constitutional infirmity in mandatory minimum guidelines sentencing schemes. In *Lockridge*, the Michigan Supreme Court determined it could eliminate the Sixth Amendment problem by making the guideline minimum range advisory and the minimum sentence a matter for the court's discretion. That was the same remedy the United States Supreme Court had adopted previously in *Booker*, 543 U.S. at 245. The *Booker* court reasoned that if the sentencing rules were not mandatory and did not impose binding requirements on sentencing judges "the statute falls outside the scope of *Apprendi's* requirement." *Booker*, 543 U.S. at 259.

Whether considered before or after *Lockridge*, the trial court's departure from the mandatory minimum sentence in Petitioner's case represents an exercise of the court's discretion.

-11-

The facts found to support the exercise of that discretion do not "increase[ ] the penalty for the crime beyond the prescribed statutory maximum[,]" *Apprendi*, 530 U.S. at 490, or "increas[e] the mandatory minimum[,]" *Alleyne*, 133 S.Ct. at 1260, and therefore need not "be submitted to a jury, [or be] proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. Petitioner has failed to demonstrate that his sentence is contrary to clearly established federal law because it violates his Sixth Amendment rights.

## Conclusion

In light of the foregoing, the Court will summarily dismiss Petitioner's application pursuant to Rule 4 because it fails to raise a meritorious federal claim.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This Court's dismissal of Petitioner's action under Rule 4 of the Rules Governing § 2254 Cases is a determination that the habeas action, on its face, lacks sufficient merit to warrant service. It would be highly unlikely for this Court to grant a certificate, thus indicating to the Sixth Circuit Court of Appeals that an issue merits review, when the Court has already determined that the action is so lacking in merit that service is not warranted. *See Love v. Butler*, 952 F.2d 10 (1st Cir. 1991) (it is "somewhat anomalous" for the court to summarily dismiss under Rule 4 and grant a certificate); *Hendricks v. Vasquez*, 908 F.2d 490 (9th Cir. 1990) (requiring reversal where court summarily dismissed under Rule 4 but granted certificate); *Dory v. Comm'r of Corr. of New York*, 865 F.2d 44, 46 (2d Cir. 1989) (it was "intrinsically contradictory" to grant a certificate when habeas action does not warrant service

under Rule 4); *Williams v. Kullman*, 722 F.2d 1048, 1050 n.1 (2d Cir. 1983) (issuing certificate would be inconsistent with a summary dismissal).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment and Order consistent with this Opinion will be entered.


Dated: March 18, 2016                    /s/ Robert Holmes Bell
                                         ROBERT HOLMES BELL
                                         UNITED STATES DISTRICT JUDGE